IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01964-WYD-CBS

STEVEN HOWARDS,
          Plaintiff,
v.

VIRGIL D. "GUS" REICHLE, JR., in his individual and official capacity;
KRISTOPHER MISCHLONEY, in his individual and official capacity;
DANIEL MCLAUGHLIN, in his individual and official capacity;
DAN DOYLE, in his individual and official capacity; and
ADAM DANIELS, in his individual and official capacity,
          Defendants.

---

## ORDER REGARDING PLAINTIFF'S UNOPPOSED MOTION FOR UNITED STATES MARSHALS TO SERVE SUBPOENA

---

Magistrate Judge Craig B. Shaffer

THIS MATTER is before the court on Plaintiff Howards' "Unopposed Motion for United States Marshals to Serve Subpoena" (doc. # 73), filed on January 24, 2008. Mr. Howards seeks an order directing the United States Marshal Service to serve a deposition notice on the Vice President, based upon his belief that Mr. Cheney is "a critical witness for deposition in this case." Plaintiff argues that the requested order is appropriate given the logistical difficulties in trying to effect service using a private process server and in light of the Office of the Vice President's and the Department of Justice's refusal to accept service of a deposition subpoena on behalf of Vice President Cheney. Plaintiff's motion concedes that the method of service would not preclude a subsequent motion to quash filed by the Vice President. On January 15, 2008, the non-party Office of the Vice President ("OVP") filed a Notice of Opposition to Plaintiff's "Unopposed"

Motion (doc. # 76).[1]

During a hearing on January 30, 2008, this court addressed the merits and practical implications of Plaintiff's Motion. In particular, the court expressed a concern that any method of service would merely precipitate a motion to quash. If those suspicions were correct, it might be more efficient to address as a threshold matter whether an involuntary deposition of the Vice President should go forward on any basis. The OVP filed an Opposition to Plaintiff's "Unopposed Motion for United States Marshals to Serve Subpoena (hereinafter "OVP's Opposition") (doc. # 89) on February 14, 2008 that specifically addressed the broader issue of whether in this case the Vice President should be compelled to participate in a deposition. Plaintiff Howards responded to those arguments on February 28, 2008 with his Response to OVP's Brief Regarding Deposing the Vice President (hereinafter "Plaintiff's Response") (doc. # 93). The court heard additional argument from counsel relative to the pending motion during a hearing on March 11, 2008.

Pursuant to an Order of Reference to Magistrate Judge (doc. # 3), dated October 4, 2006, this matter was referred the Magistrate Judge to "[h]ear and determine pretrial matters, including discovery and other non-dispositive motions" (doc. # 75). On January 25, 2008, the district court referred the instant motion to me for decision. The court has carefully considered the arguments of counsel and reviewed the pertinent briefs and referenced depositions, the entire court file, and the applicable case law, and is sufficiently advised in the premises. As the following discussion explains, I find that Plaintiff's motion is premature and should be denied at this time without

---

[1]Pursuant to D.C.COLO.LCivR 7.1A, Plaintiff's counsel was only required to confer with counsel for the named parties and captioned the instant motion as unopposed based upon those discussions.

2

prejudice.

## FACTUAL BACKGROUND

This action stems from an incident involving Mr. Howards, the Vice President of the

United States, and the Secret Service on the afternoon of June 16, 2006.  Vice President Cheney

and his grandchildren were visiting Beaver Creek, Colorado that day, as was Mr. Howards and his

family.  At some point, Mr. Howards noticed the Vice President interacting with members of the

public in an outdoor mall area.  According to the Amended Complaint, "Mr. Howards and his son

walked to where Mr. Cheney was standing and Mr. Howards, who was approximately 2-3 feet

away from Mr. Cheney addressed the Vice President by saying 'I think your policies in Iraq are

reprehensible' or words to that effect."  *See* Amended Complaint at ¶ 8.  During his deposition,

Mr. Howards described more fully his encounter with the Vice President:

> Q.      What did you say to the Vice President?
> A.      "Your policies in Iraq are disgusting."
> Q.      How did he respond?
> A.      He said, "Thank you."
> Q.      Did you shake his hand when you approached him?
> A.      No.
> Q.      Okay.  Did you touch him in any way?
> A.      When I left, I did.

<div align="center">*       *       *</div>

> Q.      At what point did you touch the Vice President?
> A.      As I was leaving.
> Q.      Okay.  And explain to me how that occurred.  What happened?
> A.      As I walked away, I touched him on the shoulder, on his right
> shoulder, with an open hand.
> Q.      Had – did you shake his hand with – at all?
> A.      No.
> Q.      So, you didn't shake hands.  You actually just touched his right
> shoulder.

<div style="margin-left: 2em;">

A.     Correct.

Q.     Did you touch his right shoulder with your left hand?

A.     Yes.

Q.     And you say your palm was open?

A.     Correct.

Q.     How forceful was it?

A.     It was a pat.

<div style="text-align: center;">*     *     *</div>

Q.     Okay.  He didn't say anything to you?

A.     No.

Q.     He didn't make any movements in response to that?

A.     No.

</div>

*See* November 19, 2008 Deposition of Steven Howards (hereinafter "Howards Deposition"), at 26-28, filed with OVP's Opposition.  Thereafter, Plaintiff was approached by Special Agent Virgil Reichle, Jr. who asked whether he had assulted the Vice President.  Although Mr. Howards denied that accusation, he was placed under arrest and told he would be charged with assaulting Vice President Cheney.  *See* Amended Complaint, at ¶¶ 13, 18 and 19.  Plaintiff subsequently was charged by the Eagle County, Colorado Sheriff's Department with harassing the Vice President in violation of Colorado state law.  On July 6, 2006, the Eagle County District Attorney moved to dismiss all charges against Mr. Howards and that motion was granted on July 10, 2006.  *See* Amended Complaint, at ¶¶ 20 and 21.

Plaintiff initiated the instant litigation on October 3, 2006 by filing a Complaint against Defendant Reichle, the Secret Service agent who placed Mr. Howards under arrest on June 16, 2006.  Plaintiff filed an Amended Complaint on May 30, 2007, which joined Secret Service agents Kristopher Mischloney, Daniel McLaughlin, Dan Doyle and Adam Daniels as defendants.  The Amended Complaint alleges that Defendants violated Mr. Howards' rights under the First and

Fourth Amendments.

Discovery has revealed significant variations in the accounts provided by the parties and other percipient witnesses to the events of June 16, 2006. Defendant Reichle has testified that on June 16, 2006, he was assigned to the Secret Service's Denver field office and serving with the protective intelligence working group which was responsible for interviewing individuals that committed criminal violations. *See* November 27, 2007 Deposition of Virgil Reichle, Jr. (hereinafter "Reichle Deposition"), at 16, filed with OVP's Opposition. As a member of the protective intelligence working group, Special Agent Reichle would decide whether probable cause existed to arrest an individual under investigation. *Id.* at 80. At the time Mr. Howards encountered the Vice President, Defendant Reichle was approximately 75 to 100 yards away from Vice President Cheney's location and had to be contacted by the dispatcher. *Id.* at 10. Therefore, Reichle did not personally witness the interaction between Plaintiff and the Vice President. As he walked to the location of the reported encounter, Defendant Reichle saw Special Agent Oscar Rosalis [sic], who said "there's been an incident involving the Vice President." *Id.* at 14. Reichle next passed Special Agent Ted Colshorn "who was the lead advance agent for the Vice President's detail." According to Reichle, Colshorn was "obviously very alarmed and concerned about something that had transpired indicated that there's a protective intelligence subject that needed to be interviewed." *Id.* at 18. Reichle then saw Assistant Special Agent in Charge Andy Wurst, who he described as "obviously very alarm (sic) and concerned about something that had transpired." *Id.* at 19.

When he arrived at the scene, Reichle received a "quick thumbnail sketch" from Special Agent Doyle, who claimed to have overheard Mr. Howards say into his cellular telephone," I'm

going to ask him how many kids he killed today." *Id.* at 20.  At that point, Reichle approached

Mr. Howards, identified himself and asked to speak to him.  Mr Howards declined to speak and

began to walk away.  Reichle claims that he asked Special Agents Doyle, McLaughlin and Daniels

to describe what they had seen.  According to Reichle, Doyle recounted the statement he had

overheard which Reichle interpreted as suggesting that when "[Howards] made his approach to

Cheney, he made his approach with malice." *Id.* at 25.  Reichle then described the information he

received from his fellow Special Agents while at the scene:

> A.    Well, they said that he approached Cheney from Cheney's 5:00 position.
> Q.    Meaning Cheney's looking straight ahead, is that midnight?
> A.    Yeah.  Cheney looking straight ahead is midnight.
> Q.    Okay.  So 5:00 would be to Cheney's left and behind?
> A.    Well, to his right and behind.
> Q.    Excuse me, to his right and behind.  I can't tell time.  Okay.
> A.    Mr. Howards was carrying a bag with unidentified contents in it, which
> was cause for alarm.
> Q.    Right.
> A.    He made unsolicited physical contact with Cheney that was perceived in an
> aggressive nature by slapping him on the back with such force that his shoulder
> dipped.
> Q.    Who told you that?
> A.    Agent Doyle and Agent Daniels.
> Q.    Okay.  What did McLaughlin say about that?
> A.    I don't recall McLaughlin saying anything at that point.
> Q.    So he came up behind Cheney and basically gave him a smack in the back,
> is that what he said, pushed him?
> A.    Yes.  He said something to the effect, something about the Iraq war.  I
> don't know.  We – we knew it had something to do with Iraq.
>
> *          *          *
>
> The Witness:  Doyle didn't hear the complete conversation.  The only thing Doyle
> was able to ascertain that – was that it had something to do with Iraq.
>
> *          *          *
>
> Q.    . . . So now, this – this touching that you're referring to, you kind of – you
> made it look like a – shove when you just demonstrated that?

A.    Well, because it was demonstrated on me.
Q    It was demonstrated on you?
A.    Yes.  Before I made a decision to make a probable cause arrest.
Q.    Who demonstrated it on you?
A.    Agent Doyle.

*    *    *

Q.    And Doyle told you he saw Howards approach Cheney from behind and do what you just did, is that right?
A.    That's correct.
Q.    And that's what Doyle told you happened, is that correct?
A.    That's correct.
Q.    And were Daniels and McLaughlin present when Doyle did this demonstration for you?
A.    Yes.

*    *    *

Q.    . . . Doyle said that this is what happened.  And you demonstrated almost a shove, a slapping kind of a shove in the back of the Vice President, correct?
A.    Yes.
Q.    And you've testified that if you were there and that happened, you would have grabbed him right then and there, right?
A.    Yes.
Q.    Okay.  Did you make inquiry as to Daniels or McLaughlin or any other agents, "Why did you guys let this guy go after he did that?"
A.    What I did do is I looked at both Daniels and McLaughlin and they basically said, "Yes, I saw it," after it was demonstrated on me.

*Id.* at 25-34.

Special Agent Doyle was serving in an undercover counter surveillance capacity during the Vice President's visit to Beaver Creek on June 16, 2006.  Defendant Doyle testified during his deposition that he overheard Mr. Howards say into his cellular telephone "I'm going to ask [the Vice President] how many kids he's killed today."  *See* December 7, 2007 Deposition of Daniel Doyle (hereinafter "Doyle Deposition"), at 46, filed with OVP's Opposition.  Doyle related that statement to Special Agents Daniels and McLaughlin who were also in the counter surveillance

unit.  Asked to describe what happened next, Defendant Doyle testified

> I still noticed that [Mr. Howards] was acting very erratic within the crowd and he was moving around the crowd very quickly.  And then – and then at that point he broke in a – in a fast walk towards the Vice President.  At that time the Vice President had a couple kids standing in front of him.  The Vice President was shaking their hands and taking some photographs with the crowd and Mr. Howard (sic) reached in in about the 3:00 o'clock position and abruptly slapped the Vice President on his right shoulder.

> When he did slap the Vice President, the Vice President's shoulder did drop, it took the Vice President by surprise, and I saw Mr. Howards make a statement.  I don't know what statement he made to the Vice President.

> At that time he peeled off of the Vice President rather abruptly and he still hung around the area where the Vice President was.  And at that time the ID agent, Mr. Reichle, was notified.

*Id.* at 49-50.  Defendant Doyle explained to Special Agent Reichle what he had seen and demonstrated "what took place."  *Id.* at 51.  Doyle recalled that Daniels and McLaughlin were in the area, but he could not say whether they observed his demonstration to Reichle.  *Id.* at 51-52.  At his deposition, Defendant Doyle expressed his belief that Mr. Howards assaulted the Vice President and that there had been probable cause to effect an arrest.  *Id.* at 55 and 68.  However the following colloquy with Plaintiff's counsel also occurred during Special Agent Doyle's deposition:

> Q.      Okay.  Did you demo for Reichle on scene what you saw happen.
> A.      Yes.
> Q.      Okay.  Was it consistent with what Reichle showed us in his videotaped deposition?
> A.      I wasn't as forceful with Mr. Reichle the day of the incident when I demonstrated to him what took place.
> Q.      Okay.  Now, would you agree that Reichle's demonstration was a straight shove kind of a motion and your demonstration was a backslap kind of a motion?
> A.      I believe that Mr. Reichle didn't show a shoving motion but a hard slap, harder than what I believe took place the date of the incident.

*Id.* at 18.

During their depositions, Defendants McLaughlin and Daniel provided a different account of the encounter between Plaintiff Howards and the Vice President. According to Special Agent Daniels, he saw

> Mr. Howards approached the Vice President working his way through the crowd rather rapidly towards the Vice President. I saw the shift agents who were close to the Vice President were, you know, monitoring the crowd.
> And then Mr. Howards came up and touched the – touched the Vice President with his left hand onto the Vice President's right shoulder.

*See* November 27, 2007 Deposition of Adam Daniels (hereinafter "Daniels Deposition), at 41, filed with OVP's Opposition. Daniels further explained

> There was – and there was – there was some force to it. And I did see the Vice President physically react to the touch. There was a reaction by the Vice President.
> I could not see – I could not see Mr. Howards's right hand. All I could see was the left hand slapping the shoulder, a little bit of – a little bit of contact, a little bit of force. The Vice President reacted, looked – looked at him, and then Mr. Howards walked away.

*Id.* at 43. Based solely upon his own observations, Special Agent Daniels did not believe that he had probable cause to arrest Mr. Howards for assaulting the Vice President. *Id.* at 48 and 58. As for any demonstrations that he provided Special Agent Reichle at the scene, Defendant Daniel testified

> Q.      Okay. Before Agent Reichle put the cuffs on Steve Howards, did he ask you what your observations were back at the scene with the Vice President?
> A.      Agent Reichle asked a general question to the agents in the area if you had seen the touch, did you see it, did you see the touch?
> And I responded yes, I saw it.
> Q.      And describe that interaction. You saw it and did he then question you about it?
> A.      No, but I demonstrated later – I – I demonstrated later for Agent Reichle what I saw.
> Q.      Later after Steve Howards was arrested?
> A.      After – after he was placed in handcuffs, yes.

> Q.      Okay.  So you demonstrated to Agent Reichle after Steve Howards had already been arrested what you saw, is that correct?  Yes or no?
> A.      Yes.

*Id.* at 62-63.

Defendant McLaughlin provided a substantially similar account of the incident.   Special Agent McLaughlin saw Mr. Howards approach the Vice President, "place his left hand on the Vice President's right should as he was walking," and then "broke off from there."  *See* November 27, 2007 Deposition of Daniel McLaughlin (hereinafter "McLaughlin Deposition"), at 31, filed with OVP's Opposition.  According to Defendant McLaughlin, he "saw what – what appeared to me to be an aggressive movement because [Mr. Howards] was walking at a high rate of speed and put his hand on him." *Id.* at 53.  Later in his deposition, Special Agent McLaughlin indicated that Mr. Howards "had his arm extended and went right into the shoulder." *Id.* at 120.  Although the Vice President looked startled by his physical contact with Mr. Howards, Special Agent McLaughlin did not believe he had probable to arrest Mr. Howards based solely upon his observations. *Id.* at 73 and 87.

Two other eye-witnesses to the June 16, 2006 encounter have been deposed.  David Bohrer, a White House photographer assigned to the Office of Vice President, testified that he heard someone "yelling about the Vice President's Iraq policy," and then saw that same person come from behind the Vice President and slap him in the upper shoulder area.  *See* December 14, 2007 Deposition of David Bohrer, at 10, filed with OVP's Opposition.  Mr. Bohrer claims that he saw,

> an individual come from the back from – from the Vice President's rear around to

his left side, perpendicular with him. Then when he came up to slap him on the back, and then he moved off to the, off to the right. And that was really the last time I saw him.

*Id.* at 13. According to Mr. Bohrer, this encounter appeared to catch the Vice President by surprise and he reacted in startled manner. *Id.* Charles Durkin, who was serving as the Vice President's personal aide on June 16, 2006, recalled seeing Mr. Howards walk at a brisk pace directly up to the Vice President, place his hand on the Vice President's arm and shake Mr. Cheney's hand, and make a statement regarding the Iraq policy. Mr. Durkin described the Vice President's reaction as very calm. *See* December 7, 2007 Deposition of Charles Durkin, at 18-19, filed with OVP's Opposition. From Mr. Durkin's perspective, the Vice President did not appear to be in distress and did not recall the Vice President reacting physically to his encounter with the Plaintiff. *Id.* at 28.

Defendants Reichle and McLaughlin also disagree as to contacts they had with each other after the incident on June 16, 2006. Special Agent Reichle claims Defendant McLaughlin rebuffed his efforts to obtain a written statement shortly after the incident and later retracted his report that Plaintiff had assaulted the Vice President. Reichle also contends that McLaughlin told him that he was specifically ordered not to discuss the matter with Reichle or other personnel in the Secret Service's Denver office. Special Agent Reichle claims he was sufficiently concerned by these developments that he suggested the Secret Service's Inspection Division conduct polygraph examinations of everyone involved in the incident.

Defendant McLaughlin provides a different version of his post-incident contacts with Special Agent Reichle. According to McLaughlin,

. . . there were two conversations. The phone call was Agent Reichle calling me

and I answered the phone. And Agent Reichle said, "I need you to change your statement," to which I responded, "What?" And he said, "I need you to change your statement, your story and mine are not the same." I said, "My statement is what I recollect from what I participated in. We are not having this conversation." Then I hung up on him. . . . The next conversation was the next morning when I was leaving the hotel for work. Agent Reichle was waiting for me outside, and approached me and said, "That the Vice President's detail is involved in a cover up." I said, "What are you talking about and he said you guys are involved in a cover up"? And then I don't recall exactly what he had to say after that. And then followed up by "You need to have a meeting with myself and my supervisor today." And I said, "Absolutely as long as my supervisor is notified, I'll meet with you." And that never came about.

See McLaughlin Deposition, at 134-35.

Against the backdrop of these conflicting witness accounts, Plaintiff seeks to depose the Vice President.

## ANALYSIS

Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information. *United States ex rel. Schwartz v. TRW, Inc.*, 2002 WL 31688812 (C.D. Cal. 2002). To that end, Rule 26(b) permits discovery "regarding any matter . . . that is relevant to the claim or defense of any party" or discovery of any information that "appears reasonably calculated to lead to the discovery of admissible evidence." *See* Fed. R. Civ. P. 26(b)(1). *See also Williams v. Board of County Commissioners*, 192 F.R.D. 698, 702 (D. Kan. 2000) (a request for discovery should be considered relevant if there is any possibility the information sought may be relevant to a claim or defense). Rule 26(d) also recognizes that a party may utilize discovery tools in any sequence they prefer, unless otherwise ordered by the court "for the parties' and witnesses' convenience and in the interests of justice." *See* Fed. R. Civ. P. 26(d)(2)(A).

The right to civil discovery, however, is not absolute or unlimited. Limitations on the discovery process may, at times, seem to interfere with the fact-finding process. For example, discovery may be curtailed where the court determines that the desired discovery is unreasonable or unduly burdensome given the needs of the case, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2).[2] The Federal Rules of Civil Procedure permit a court to restrict or preclude discovery when justice requires in order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). Other constraints on civil discovery are codified in the Federal Rules of Civil Procedure. *See, e.g.,* Fed. R. Civ. P. 26(b)(2)(B) (a party need not provide discovery of electronically stored information from sources that are not reasonably accessible because of undue burden or cost, absent a showing of good cause); Fed. R. Civ. P. 26(b)(3)(A) (a party may not discover materials prepared in anticipation of litigation or for trial unless those materials are otherwise discoverable under Rule 26(b)(1) and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means"); Fed. R. Civ. P. 26(b)(4)(B) (facts known by or opinions held by a party's non-testifying expert may be discovered only upon a "showing of exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means').

---

[2]These same considerations are incorporated in Fed. R. Civ. P. 26(g)(1) which requires counsel to certify that discovery requests are "warranted by existing law" and "neither unreasonable nor unduly burdensome . . . considering the needs of the case, prior discovery in the case, the amount in controversy and the importance of the issues at stake in the case." *See Imperial Chemicals Indus., PLC v. Barr Labs., Inc.*, 126 F.R.D. 467, 473 (S.D.N.Y. 1989) (holding that deposition notices violated Rule 26(g)).

Both Mr. Howards and the OVP acknowledge that limitations may be placed on a litigant's access to high government officials through the discovery process. *See* OVP's Opposition, at 7-9, and Plaintiff's Response, at 14-15. They simply disagree on how, and to what extent, those limitations are applicable under the facts in this case.

The United States Supreme Court has recognized that a civil litigant's need for discovery may be constrained where discovery requests impinge on the constitutional prerogative of officials in the Executive Branch to give advice and recommendations to the President. *See Cheney v. United States District Court*, 542 U.S. 367, 385 (2004). Moreover, "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking officials actions." *Simplex Time Recorder Co. v. Secy. of Labor*, 766 F.2d 575, 586 (D.D. Cir. 1985). Here, it does not appear that Mr. Howards is seeking discovery that would implicate executive privilege or official actions taken by the Vice President.

Both sides have cited the decision in *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007), which as Plaintiff correctly points out, held that "[d]epositions of high ranking officials may be permitted where the official has first-hand knowledge related to the claim being litigated." Counsel also acknowledge that *Bogan* further limits depositions of high government officials to those situations "where it is shown that other persons cannot provide the necessary information." *Bogan v. City of Boston*, 489 F.3d at 423.[3] *See also In re United States*, 197 F.3d 310, 314 (8th

[3]Courts have applied a similar standard in deciding whether to allow the deposition of a high corporate official, *see, e.g., General Star Indemnity Co. v. Platinum Indemnity Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002) (deposition permitted where corporate executives had personal knowledge and the party seeking discovery had already pursued alternative sources); *Wertheim Schroder & Co. v. Avon Prods., Inc.*, 1995 WL 6259, *2 (S.D.N.Y. 1995) (deposition allowed where testimony of other witness indicated that chief financial officer had personal knowledge not wholly duplicative of other discovery), or the deposition of a non-party journalist. *See, e.g.,*

Cir. 1999); *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993);  *Sweeney v. Bond*, 669 F.2d

542, 546 (8th Cir. 1982); *Buono v. City of Newark*, 2008 WL 544664 (D.N.J. 2008); *Marisol A. v.*

*Giuliani*, 1998 WL 132810 (S.D.N.Y. 1998); *United States v. Miracle Recreation Equip. Co.*,

118 F.R.D. 100, 105 (S.D. Iowa 1987).  Mr. Howards and the OVP simply disagree as to

whether this standard has been met in this case.

    Mr. Howards' counsel states that "the only people [he] knows of who witnessed the

events in question are the deponents who have thus far been deposed." but insists that "the Vice

President is the one person in the absolute best position to answer the questions necessary to the

resolution of this case."  *See* Plaintiff's Response, at 12 and 15.  According to Plaintiff's counsel,

> Only the Vice President can inform Plaintiff as to whether he felt startled (if the
> answer is "no" it would cast doubt on the Defendants' testimony that he was), only
> the Vice President can inform Plaintiff as to whether he had been "slapped" or
> "forcefully touched" by Mr. Howards.  It is likely that only the Vice President can
> tell us precisely what it was that Mr. Howards said to him.  Only the Vice
> President can tell us if he was offended at the remark and ordered Mr. Howards'
> arrested in relation.  Only the Vice President can tell us whether he believed he had
> been "assaulted" as Reichle contended, or harassed as the Eagle County charged
> indicated.

*See* Plaintiff's Response, at 16.

    The Amended Complaint alleges that the Defendants violated Plaintiff's Fourth

Amendment rights when they "intentionally, knowingly, recklessly, and excessive subdued,

restrained, detained and falsely arrested Mr. Howards, without any reasonable justification or

---

*Wright v. F.B.I..*, 381 F. Supp. 2d 1114, 1116 (C.D. Cal. 2005) (a litigant is entitled to overcome
a journalist's qualified privilege only by showing that the requested materials are unavailable
despite exhaustion of all reasonable alternative sources and showing actual relevance), *rev'd and*
*remanded on other grounds*, 2007 WL 1879794;  *Tripp v. Dep't of Def.*, 284 F. Supp.2d 50, 60
(D.D.C. 2003) (reporters should be compelled to disclose their sources only after the litigant has
shown that he has exhausted every reasonable source of information).

probable cause." *See* Amended Complaint, at ¶ 27. Plaintiff further alleges in his second claim

for relief that the Defendants "had no probable cause or reasonable suspicion to believe that

Steven Howards had committed any violation of the law prior to searching his person pursuant to

the unlawful arrest." *Id.* at ¶ 30. While the Vice President certainly had some contact with Mr.

Howards, the significance of his potential testimony must be measured against the legal standard

governing Plaintiff's Fourth Amendment claims.

"Probable cause to arrest depends 'upon whether, at the moment the arrest was made . . .

the facts and circumstances within (the arresting officers') knowledge and of which they had

reasonably trustworthy information were sufficient to warrant a prudent man in believing that the

(suspect) had committed or was committing an offense." *Adams v. Williams*, 407 U.S. 143, 148

(1972) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). *See also Baptiste v. J.C. Penney

Co.*, 147 F.3d 1252, 1256 (10th Cir. 1998). The probable cause standard must be applied from the

perspective of an experienced law enforcement officer. *Cf. United States v. Gilliam*, 167 F.3d

628, 633 (D.C. Cir. 1999) (acknowledging that "certain conduct that may appear 'innocent to a

lay person may have entirely different significance to an experienced [law enforcement] officer'");

*United States v. Knox*, 888 F.2d 585, 587 (8th Cir. 1989) ("actions that a lay person could view as

innocent may be viewed in a more significant, inculpatory light by a trained narcotics officer

possessing information from various sources"). Application of the probable cause standard in this

case will not turn on whether the Vice President personally felt he had been "slapped" or

"forcefully touched" by Mr. Howards.

Alternatively, Plaintiff argues that "only the Vice President can tell us whether he ordered

an arrest of Steve Howards because he was angered by the criticism" conveyed by Mr. Howards'

comment. *See* Plaintiff's Response, at 13. This assertion would seem to address Plaintiff's third

claim for relief, which alleges that Defendants intimidated, threatened, searched and falsely

arrested Mr. Howards because he was exercising his First Amendment right to criticize the

actions of the Vice President and the Bush administration in pursuing the war in Iraq. *See*

Amended Complaint, at ¶¶ 34, 36 and 40. Yet, Defendant Reichle has testified that he decided to

arrest Mr. Howards based upon his own understanding of the totality of the circumstances. *See*

Reichle Deposition, at 34.[4] Special Agent Reichle's deposition testimony makes clear that he

never discussed the incident involving Mr. Howards with the Vice President and received no

instructions or information from the Vice President immediately prior to arresting Mr. Howards.

*Id.* at 72. In light of Defendant Reichle's testimony, it is difficult to see how a deposition of the

Vice President would be relevant to Plaintiff's third claim for relief.

However, the Advisory Committee Notes to the 2000 Amendments to Rule 26(b)(1)

recognize that "information that could be used to impeach a likely witness, although not otherwise

relevant to the claims or defenses, might be properly discoverable." In that respect, Plaintiff's

counsel states that a deposition of the Vice President is necessary in light of Defendant Reichle's

speculation "that the lies being told by McLaughlin and Daniels were ordered by the Vice

President of the United States" or that the Vice President "ordered Agents Daniels and

McLaughlin to falsify their reports to avoid any inconvenience to him in the future." *See*

Plaintiff's Response, at 10 and 14. This argument relies upon a mis-characterization of Special

Agent Reichle's testimony.

---

[4]Special Agent Daniels agrees that Defendant Reichle "made the decision to arrest" Mr.
Howards. *See* Daniels Deposition, at 48.

During his deposition, Special Agent Reichle was asked about a telephone conversation he had with Special Agent McLaughlin three or four hours after the incident involving Mr. Howards and the Vice President.

Q.    Okay.  McLaughlin tells you there was no assault.  Well, describe for me the conversation you had with him because you must have then said, "Look, you know, you saw what Doyle did and you said that's what happened and now you're telling me that's not what happened."  Did you have a conversation to that effect?

A.    Yes.

Q.    Well, explain how that all went down.

A.    I asked him if someone was pressuring him to change his testimony.

Q.    What did he say?

A.    He says, "No."  I said, "Well, this isn't the rendition that I had heard three to four hours ago."

Q.    And what did he say?

A.    He hung up.[5]

                    *    *    *

Q.    What's the source of all this?  Why – why all this conflict here?

A.    That would require speculation, and I'm not going to speculate.

                    *    *    *

Q.    Okay.  So you know the inner workings, you know the politics, you know what's going on. What's it all about?

                    *    *    *

A.    Once again, this is mere speculation on my part.

Q.    Absolutely.

A.    First and foremost, they probably just don't want to inconvenience the Vice President.  Certainly they don't want him to be bothered with a deposition.  Perhaps Vice President Cheney just was willing to let it go, you know.

---

[5]Defendant Reichle testified that he had another conversation with Special Agent McLaughlin approximately 48 hours after the incident.  According to Reichle, McLaughlin said that he had been instructed by an unidentified supervisor not to discuss the incident with Reichle or any other member of the Denver office.  *See* Reichle Deposition, at 41.  During his deposition, Special Agent McLaughlin identified that individual as Mike Germain, a supervisor on the Vice President's detail.  *See* McLaughlin Deposition, at 139-140.

> He's a tough guy, played high school football. He could very well have
> been that, you know what, hey, a lot of people don't like me, oh well. And
> moved on. I don't know.

*See* Reichle Deposition, at 47-50. The foregoing testimony does not support counsel's accusation

that Vice President Cheney "ordered" any Secret Service agent to change their

account of the June 16, 2006 incident.[6] To the contrary, Defendant Reichle seems to speculate

that perhaps Secret Service officials made an independent decision to drop the matter in an effort

to avoid inconveniencing the Vice President.

    There is no evidence to suggest that Vice President Cheney issued any instructions to

Special Agent Daniels or Special Agent McLaughlin. Special Agent Daniels has testified that he

never interviewed the Vice President regarding the June 16, 2006 incident, and does not know

whether Vice President Cheney ever discussed with anyone his encounter with Mr. Howards. *See*

Daniels Deposition, at 67 and 83. Special Agent McLaughlin never discussed the Howards

incident with the Vice President. *See* McLaughlin Deposition, at 52 and 81. Indeed, Defendant

McLaughlin testified that over the course of his career with the Secret Service he has had only

passing conversations with the Vice President:

> Vice President asked me if it had been raining all night one time when I was
> standing out by the front door. And I believe we said hello to each other on a
> number of occasions, but to have an extended conversation, no, sir.

*Id.* at 74.

    I am aware of deposition testimony suggesting that perhaps the Vice President spoke to a

---

[6]Plaintiff's Response states that "Reichle speculated that the Vice President put out the word that there was 'no assault' and ordered that the agent's reports be written to so reflect." *See* Plaintiff's Response to OVP's Brief, at 6. Unfortunately, this statement in Plaintiff's Response is not accompanied by a specific page reference to Defendant Reichle's deposition.

senior Secret Service official after Mr. Cheney and Mr. Howards parted company. Special Agent

Reichle recalls being told by his supervisor in the Denver office, Lon Garner, that Mr. Garner had

spoken to "Special Agent in Charge Mike Lee face to face, and Mike Lee stated that he was there

and, even though there was physical contact, Mike Lee didn't perceive it as an aggressive and

threatening nature, and so therefore there was no assault." *See* Reichle Deposition, at 52. Later

in the same deposition, Defendant Reichle and Plaintiff's counsel had the following colloquy:

> Q.      Okay. Has anybody talked to the victim of this crime that you know of?
> A.      Allegedly, Special Agent in Charge Mike Lee talked to the Vice President.
> And the Vice President Cheney indicated that he didn't feel that he was assaulted.
> Now, that's hearsay, but that was – that was indicated to me through my
> supervisor Lon Garner.
> Q.      Do you recall when Lee talked to – he said he talked to the Vice President?
> A.      According to Special Agent in Charge Lon Garner, yes, that – allegedly
> this conversation happened within – within a hour or two of the – of the incident.

*Id.* at 58. If Special Agent Garner and Defendant Reichle are to be believed, Special Agent Lee

would seem to be a potential source of information as to any orders issued by the Vice President

in the wake of the incident with Mr. Howards. This court is not aware of any efforts Mr.

Howards or his counsel have made to depose Special Agent Lee regarding any conversations he

may have had with the Vice President concerning the incident at Beaver Creek. Alternatively, Mr.

Howards could address the same topic in a Fed. R. Civ. P. 30(b)(6) deposition of a Secret

Service representative.

    In the final analysis, Mr. Howards' request to depose the Vice President requires this

court to balance competing considerations. I agree that as a prerequisite for deposing Mr.

Cheney, Plaintiff should not be required to identify, locate and interview *every* person who was

present on the Beaver Creek mall on June 16, 2006 and potentially in a position to observe the

interaction between Mr. Howards and the Vice President.[7]  Such a inflexible requirement would

seem to be inconsistent with the spirit of the Federal Rules of Civil Procedure, which seek "to

secure the just, speedy, and inexpensive determination of every action and proceeding."  *See* Fed.

R. Civ. P.  1.  However, that same principle underlies Rule 26(b)(2)(C), which permits this court

to limit the methods or extent of discovery otherwise permitted by the Federal Rules of Civil

Procedure where I find that "the burden or expense of the proposed discovery outweighs its likely

benefit."  *Cf. Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979) (holding that

interrogatories are an appropriate discovery method in lieu of deposing a high ranking

government official); *Am. Civil Liberties Union v. Gonzales*, 237 F.R.D. 120, 122-23 (E.D. Pa.

2006) (allowing plaintiffs to serve contention interrogatories on the Attorney General after finding

that plaintiffs had not adequately proven "that oral deposition testimony on the topics listed in

their notice of deposition [was] the least intrusive or burdensome means by which to garner

discoverable information from defendant"); *Alexander v. F.B.I.*, 186 F.R.D. 1, 5 (D.D.C 1998)

(staying the depositions of high-ranking White House staff, but permitting plaintiffs to serve

interrogatories as an initial step to determine whether those individuals had any knowledge

relevant to the litigation); *Cmty. Fed. Sav. and Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96

F.R.D. 619, 621-22 (D.D.C. 1983) (in denying plaintiff's request to depose two members of the

Federal Home Loan Bank Board, found that plaintiff "has not shown that the information it hopes

---

[7]However, deposition testimony places Special Agent Mike Lee, the individual in charge
of the Vice President's security detail, and his assistant, Special Agent Andy Wurst, in close
proximity to the Vice President at the time Mr. Howards approached.  *See* Reichle Deposition, at
19 and 51.  Defendant Reichle has also identified Special Agents Rosales and Colshorn as Secret
Service agents in the Vice President's detail at Beaver Creek.  *See* Reichle Deposition, at 14 and
18.  To my knowledge, none of these individuals has been deposed.

to elicit from them is not ascertainable by way of interrogatories addressed to the Board, the deposition of a single spokesman designated to testify for it, or the testimony of the nine other witnesses whose depositions the Board has not opposed").

I am not foreclosing, at some future point, the need to depose the Vice President in connection with this case. This court simply finds that Plaintiff has not made a sufficient showing to warrant that deposition at this time. Previous depositions have identified by name and position individuals who apparently have relevant information that might obviate the need to depose the Vice President. Plaintiff has not demonstrated that these individuals cannot provide the information he claims is only accessible through the Vice President. That shortcoming is particularly significant in this case, where Plaintiff's deposition request is driven, in large part, by speculation on the part of Defendant Reichle. Consistent with my discretion under Rule 26 and the weight of judicial precedents, I will require Plaintiff to pursue discovery from those identifiable sources before the court will consider a request to depose the Vice President or address the specific procedure by which discovery may be obtained from the Vice President.

Accordingly, at this time, I will deny without prejudice Plaintiff Howard's Unopposed Motion for United States Marshals to Serve Subpoena (doc. # 73). Plaintiff Howard may re-file his motion should further discovery establish that the Vice President has information relevant to the claims and defenses in this case and that other persons reasonably available cannot provide the same necessary information.

DATED at Denver, Colorado this 15th day of April, 2008.

BY THE COURT:


   s/ Craig B. Shaffer
United States Magistrate Judge